IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


DAVID B. CRACE,

                    Plaintiff,

          vs.                              Civil Action 2:09-CV-551
                                           Magistrate Judge King

DEPUTY AMANDA EFAW, *et al.*,

                    Defendants.


## OPINION AND ORDER

This is a civil rights action under 42 U.S.C. § 1983 in which
plaintiff alleges that defendants, deputies of the Lawrence County
Sheriff's Department, subjected plaintiff to excessive force following
his 2005 arrest.  With the consent of the parties, 28 U.S.C. § 636(c),
trial to the Court on the issue of liability began on February 21,
2012 and concluded on February 22, 2012.[1]  At the parties' request and
with consent of the Court, the parties filed post-trial briefs.  *See*
Doc. Nos. 60, 61, 62.  This matter is now ripe for resolution.

## I.    DEFENDANTS' MOTION FOR DIRECTED VERDICT

Counsel for defendants[2] moved for a directed verdict after the
close of plaintiff's case-in-chief.  The Court, which construes
defendants' motion as a request for judgment on partial findings
pursuant to Rule 52(c) of Federal Rules of Civil Procedure, reserved

---

[1]The parties waived trial by jury.  *Order*, Doc. No. 53; *Final Pre-Trial
Order*, Doc. No. 56.  At the request of the parties, this Court bifurcated the
issues of liability and remedy.  *Order*, Doc. No. 53.

[2]The remaining defendants are Boyd Blake and Richard Slack.  The Court
previously dismissed the claims against Amanda Efaw, Wallace Workman and Luke
Jenkins.  *Order*, Doc. No. 16; *Preliminary Pretrial Order*, Doc. No. 17, p. 2;
*Opinion and Order*, Doc. No. 43, p. 14.

ruling on the motion until the close of evidence.  Pursuant to the provisions of Fed. R. Civ. P. 52(a), the Court now makes the following findings of fact and conclusions of law.  *See* Fed. R. Civ. P. 52(c) (providing that a court, during a nonjury trial, may "decline to render any judgment until the close of evidence.  A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a)").

## II.  FINDINGS OF FACT

### A.    Images of the Events at the Lawrence County Jail

Late in the evening of April 3, 2005, plaintiff, a resident of Chesapeake, Ohio, was arrested for domestic violence and taken to the Lawrence County Jail ("the jail").  *Defendants' Exhibit B.*[3]  The jail contains a secured booking area, which was, at the time, monitored by a camera that recorded images, but not audio, of the events of that night. That camera was one of 16 closed circuit TV cameras placed throughout the jail.  Each camera captured still shots that were then fed to a common digital recorder. Jeffrey Lawless, the current Sheriff of Lawrence County who was the Jail Administrator in 2005, testified that the technology utilized in the cameras throughout the jail in 2005 left short gaps between each frame. Although *Defendants' Exhibit D* appears to be a video stream and although the parties and counsel referred to the exhibit as a "video," *Defendants' Exhibit D* actually reflects a series of still shots from the camera in the booking area. According to Sheriff Lawless, *Defendants' Exhibit D,* which was created by the security company that installed new cameras in the jail, is an

---

[3]Sheriff Lawless testified that *Defendants' Exhibit B* is a true and accurate copy of an investigation report and witness statements.

accurate and complete copy of the recording from the time that plaintiff arrived in the booking area until the time that he left it that night.

Although plaintiff alleged, during his trial testimony, that defendants or their counsel deleted or edited portions of the video stream, there is no evidence to support that allegation. Moreover, plaintiff's own counsel stipulated to the authenticity of the images reflected in *Defendants' Exhibit D* and the *Final Pretrial Order*, Doc. No. 56, reflects all parties' intention to utilize the exhibit. *Id*. at 3.

## B. The Booking Process and Use of Force Continuum

Defendant Deputy Richard Slack[4] testified that he was on duty in the booking area on the night of April 3, 2005, helping his colleagues book incoming individuals. The booking process, which usually takes about 30 minutes, involves the removal of handcuffs, patting down the detainee, recording of the detainee's pertinent information, fingerprinting the detainee, securing jewelry and valuables, taking a mug shot and, finally, placing the detainee in a cell.

In addition to defendant Slack, defendant Corrections Officer Boyd Blake, former defendant Amanda Chaffins,[5] Officer Luke Jenkins, Patrolman Workman and Corrections Officer Beals were also present in

---

[4]Defendant Slack is no longer employed by the Lawrence County Sheriff's Office, having left in 2006.

[5]On April 3, 2005, Amanda Chaffins used her maiden name, "Efaw." Chaffins no longer serves in law enforcement, having resigned from the Lawrence County Sheriff's Office in 2010.

the booking room that evening. *See Defendants' Exhibit 5*.[6] According to defendant Blake, none of the officers was armed with any weapon and no chemical agents were permitted in the jail. Defendants Slack and Blake and Officer Jenkins testified that they had completed basic police officer training and, specifically, had been trained on the use of force continuum.

According to Raymond K. Hamilton, defendants' expert witness,[7] the use of force continuum is the standard in Ohio and utilized across the country. The use of force continuum is based on the Fourth Amendment, focusing on what is reasonable based on contemporary societal expectations. Under this continuum, a law enforcement officer has wide latitude in matching a particular forceful response to a particular action. The continuum begins with officer presence and continues through the ultimate use of lethal force.

Hamilton went on to testify that the use of force continuum includes a balance displacement technique, which disrupts a person's center of balance and exerts force in order to gain control over the individual. According to Hamilton, once an individual's balance has been displaced, ground stabilization may also be necessary.

The use of force policy promulgated by the Lawrence County Sheriff's Office, *Plaintiff's Exhibit 14*, utilizes the use of force

---

[6]Defendant Blake testified that he prepared *Plaintiff's Exhibit 5*, a typed statement following plaintiff's release from the jail, as part of an internal investigation into plaintiff's complaints.

[7]Hamilton has worked as a law enforcement officer and internal affairs supervisor and has served for more than five years as a commander trainer with the Columbus Police Department. *See Defendants' Exhibit C* (Hamilton's *curriculum vitae*). Numerous police departments across the country have consulted Hamilton to assist in the formulation of policy or training. Hamilton teaches policies, procedures and best practices, focusing on boundaries set by the Fourth Amendment to the United States Constitution.

continuum. Specifically, that policy explains when force may be used

in the jail:

> The practice of using force against an inmate or a visitor
> by jail personnel is restricted to situations where the use
> of physical force is necessary only to:
>
> A.    Protect yourself from assault or threat of assault.
> B.    Protect others from assault or the threat of assault.
> C.    Prevent the escape of an inmate(s).
> D.    Prevent the inmate(s) from harming themselves.
> E.    Control an inmate(s) who refuses to obey jail rules
>       governing prisoner conduct.

*Plaintiff's Exhibit 14*, p. 1. The policy goes on to explain the

procedure when using force:

> A.   **USE OF FORCE**
>
> > 1.   Jail personnel will use only the amount of force
> > necessary to contain or control the inmate(s).
> >
> > 2.   Jail personnel will use acceptable techniques or
> > approved special equipment when the use of
> > physical force is necessary.
> >
> > 3.   Jail personnel will use physical force only as a
> > last resort.
> >
> > 4.   Striking or hitting an inmate with fists will be
> > considered excessive force in containing or
> > controlling an inmate(s).
>
> > **EXCEPT WHEN:**
> >
> > > a.   Self-defense from assault by a prisoner.
> > >
> > > b.   Defense of a third person from assault by a
> > > prisoner.

*Id*. at 1-2.

**C.   Defendants' Prior Encounters with Plaintiff**

Defendants Slack and Blake had experienced prior encounters with

plaintiff in the jail and knew that plaintiff had trouble with one of

his arms, which was described as "busted." *See also Plaintiff's*

5

*Exhibit 3*.[8]  A 1988 motor vehicle accident had seriously injured plaintiff's right elbow, which had been reconstructed with screws and plates. On the night in question, plaintiff wore an elbow brace or sleeve because of this injury.

### D. Plaintiff's Demeanor Before and After Entering the Jail

Prior to plaintiff's arrival at the jail, a dispatcher had warned that an unruly prisoner was on his way; the prisoner had moved his cuffed hands from the back to the front and the arresting officer had had to stop the car in order to reposition him. *See also Plaintiff's Exhibit B*, p. 4 (statement of an assisting arresting officer describing plaintiff as verbally abusive and difficult). By the time plaintiff arrived at the jail, more officers were present than would ordinarily be there because, as was common late at night when staffing was low, nearby law enforcement officers arrived at the jail to assist with the reported unruly prisoner.

According to defendants Slack and Blake, former Deputy Chaffins and Officer Jenkins, plaintiff was intoxicated, combative, aggressive and verbally abusive when he entered the booking area.  Although plaintiff testified that he had drunk only two beers that evening, the Court finds that plaintiff's testimony, on this point and on many other points, to be entirely unworthy of credit.[9]  Plaintiff's behavior

_____

[8]Defendant Slack testified that he prepared *Plaintiff's Exhibit 3*, a handwritten statement on Lawrence County Sheriff's Office letterhead, in response to a complaint that plaintiff filed with the Sheriff's Office.

[9]No breathalyzer or field sobriety tests were administered at the jail that night.  Defendant Blake explained that a breathalyzer machine was not available at the jail and that he was not certified to administer field sobriety tests.  He was not certain, at trial, whether anyone else present that night was certified to administer such tests.

that evening suggested an intoxicated state and defendants Slack and Blake could smell alcohol on plaintiff. *See also Plaintiff's Exhibit 3.* Officer Jenkins and former Deputy Chaffins also believed that plaintiff was drunk or on drugs. *See Plaintiff's Exhibit 2*, p. 1.[10] The Court expressly credits the testimony of defendants and their witnesses in this regard.

### E. Defendants Begin Booking Plaintiff

Plaintiff testified that, from the moment that he arrived in the booking area, he was subjected to brutal assaults in the form of shoving, kicking, hitting and throws to the floor; plaintiff also testified that a clump of his hair was pulled from the back of his head. *See Plaintiff's Exhibit 1.* Having had the opportunity to observe plaintiff's demeanor and consider his testimony in light of the objective evidence, the Court declines to credit plaintiff's testimony in this regard. Plaintiff's testimony was frequently exaggerated, internally inconsistent and grossly self-serving. On the one hand, he testified that he has little memory of the events of that night because of brain damage suffered at the hands of defendants but, on the other hand, he testified in great detail when it suited his purpose; he also acknowledged that hospital records did not document injuries consistent with his testimony. The Court will not further address these allegations

Because plaintiff was handcuffed when he arrived at the jail, defendant Blake assisted plaintiff to a sitting position on the bench and removed plaintiff's handcuffs. Plaintiff complied when defendant

---

[10]*Plaintiff's Exhibit 2* is a copy of the booking sheet prepared by former Deputy Chaffins after plaintiff's arrival at the jail.

Blake instructed him to move to a wall to be frisked.[11] Defendant Blake thereafter directed plaintiff back to the bench and plaintiff complied.

Former Deputy Chaffins testified that plaintiff was agitated and cursing throughout the booking process. It was she who prepared a medical screening form ("screening form"), *Plaintiff's Exhibit 2*, as part of the booking process. That form indicates that plaintiff was exhibiting "assaultive, violent, loud, or obnoxious behavior," *id.* at 1, characterizations that were based on her personal observations of plaintiff. Plaintiff's behavior did not suggest a risk of suicide or assault on others, *id.*, but Chaffins testified that she may have completed that entry earlier in the evening and prior to the alleged uses of force about which plaintiff complains in his post-trial memoranda.[12]

### F. First Alleged Use of Force: Grabbing Plaintiff's Arm

The parties disagree as to what happened next in the booking process. According to plaintiff, defendants yelled a demand for his fingerprints, and plaintiff reminded them that his prints were already on file. *See also Defendants' Exhibit B*, p. 3. According to plaintiff, defendant Blake then grabbed plaintiff's right shoulder, injuring the right arm and pulled plaintiff off the bench to a standing position.

In contrast, defendant Blake testified that his tone was not loud

---

[11]There is no evidence that plaintiff had a weapon at any time during the booking process.

[12]The screening form also noted that plaintiff had plates and screws in his elbow. *Id.* at 2.

when he asked for plaintiff's fingerprints.  Defendant Blake
characterized plaintiff as angry and combative; according to defendant
Blake, plaintiff refused to cooperate and responded, "Fuck you.  You
already got them.  You are not getting them again." *See also
Plaintiff's Exhibits 5* and *6*.  Defendant Slack testified that
defendant Blake asked plaintiff more than once for his fingerprints,
but that plaintiff refused to comply.  According to defendant Slack,
plaintiff instead responded by saying, "Fuck you.  You already got
them on file."  Similarly, Chaffins testified that plaintiff refused
to comply with defendant Blake's request, responding, "No.  Fuck you.
You're not getting them." Defendant Blake explained to plaintiff that
taking fingerprints is standard policy. *See also id.*  When plaintiff
continued to refuse to proceed to fingerprinting, defendant Blake
assisted plaintiff to his feet by tugging on plaintiff's right upper
shirt sleeve.

*Defendants' Exhibit D* is inconclusive as to what transpired when
defendant Blake made initial physical contact with plaintiff.  For the
reasons state *supra*, the Court assigns little weight to plaintiff's
version of this particular exchange. Instead, the Court credits the
testimony of defendant Blake and the corroborating testimony of
defendant Slack and Chaffins, *i.e.*, that plaintiff refused to
participate in the fingerprinting process and that, in response,
defendant Blake assisted plaintiff to his feet by tugging on his right
shirt sleeve.

**G.    Second Alleged Use of Force:  Knocking Plaintiff to the
Ground**

The parties also dispute what happened once plaintiff was on his

feet following the demand for fingerprints. Defendant Blake testified that plaintiff pulled away, but not completely away, from him. Defendant Slack and Chaffins also testified that plaintiff tried to pull away from defendant Blake after refusing to proceed to the fingerprinting station.

According to defendant Blake, plaintiff also tensed his body and clenched his hands, which were at his side. Plaintiff's body language suggested to defendant Blake that plaintiff was angry and defendant Blake concluded that plaintiff could strike him or attempt to strike him or someone else. Taking into account plaintiff's behavior and intoxicated state, defendant Blake decided to take plaintiff to the floor quickly and before plaintiff had a chance to act. In doing so, defendant Blake held plaintiff's shirt and arm and swept plaintiff's feet out from under him, taking plaintiff down slowly and holding him all the way to the floor. By wrapping plaintiff's upper body and using his right hand to support plaintiff's fall, plaintiff's head did not strike the ground first, if at all.

Conversely, plaintiff denied that he pulled away from defendant Blake's grasp, clenched his fists or otherwise acted in a threatening manner. In fact, plaintiff testified, he was quite cooperative that night. Nevertheless, according to plaintiff, defendant Blake grabbed plaintiff's bad arm and threw him down so that plaintiff hit the concrete floor face first with nothing to break his fall. Not only did defendant Blake not break plaintiff's fall, he actually got out of the way so that plaintiff would hit the floor.

Having reviewed *Defendants' Exhibit D,* the Court is persuaded that, once he was on his feet, plaintiff moved away from defendant

Blake's grasp.  *See id.,* at 11:37:24 P.M.  Moreover, the credible testimony of other witnesses supports this finding and defendant Blake's testimony: Defendant Slack and Chaffins testified that, once on his feet, plaintiff tried to pull away and refused to be fingerprinted. Furthermore, plaintiff concedes in his post-trial memorandum that he leaned away from defendant Blake.  *See* Doc. No. 61, p. 18.  Although plaintiff now suggests that the movement was consistent with a natural impulse to protect plaintiff's injured arm from defendant Blake's tug, *id.*, the Court rejects this post-trial explanation.  Plaintiff did not testify at trial that he moved away from defendant Blake's grasp because of his injured arm; plaintiff specifically denied that he pulled away or attempted to break free from defendant Blake's grasp.

In addition, although plaintiff's hands are not visible on *Defendants' Exhibit D,* the Court credits the corroborating testimony of defendant Slack, Chaffins and Officer Jenkins that plaintiff made a fist with at least one hand.  The Court also credits the testimony of officer Jenkins and defendant Slack that plaintiff adopted an aggressive stance.

In short, the Court finds that, once on his feet, plaintiff tried to move away from defendant Blake in an uncooperative manner, balled at least one fist, tensed his body and adopted an aggressive stance. The Court also find that, in taking plaintiff to the floor, defendant Blake took appropriate action to ensure that plaintiff's head did not hit the floor first, if at all.

**H.  Third Alleged Use of Force:  Restraining Plaintiff on the Floor**

11

*Defendants' Exhibit D* indicates that plaintiff was quickly on the floor after defendant Blake took him down. *See id.*, at 11:37:24 P.M. to 11:37:29 P.M. The parties again dispute what happened once plaintiff was on the floor.[13] According to plaintiff, he was stunned and unable to speak. Nevertheless, plaintiff testified, several people jumped on top of him and someone put a knee in his back. Plaintiff also testified that someone grabbed his injured right arm and stretched it above his head, dislocating his arm. He also testified that Chaffins did not participate in restraining him on the floor.

Conversely, defendant Blake testified that, once plaintiff was on the floor, he and Officer Jenkins[14] each placed one hand on plaintiff's back while Chaffins held plaintiff's legs. Defendant Blake expressly denied that any other force was used against plaintiff at that time. The officers held plaintiff on the floor while they waited for defendant Slack to bring the restraint chair. Similarly, defendant Slack, who is 6'3" and who weighs approximately 260 pounds, testified that defendant Blake restrained plaintiff's right side, while Officer Jenkins assisted with plaintiff's left shoulder and Chaffins controlled plaintiff's legs. Defendant Slack denied touching plaintiff while he was on the floor. Instead, defendant Slack testified, defendant Blake directed him to get the restraint chair.

*Defendants' Exhibit D* establishes that plaintiff was restrained

---

[13]As noted *supra*, the Court has rejected plaintiff's testimony of more brutal assaults during this process. The Court also notes that plaintiff's post-trial memoranda merely characterize defendants' actions as "holding [plaintiff] down on the ground." *See, e.g.,* Doc. No. 61, p. 19.

[14]Officer Jenkins testified that he is approximately 6'5" or 6'7" and weighed approximately 275 pounds at the time of this event.

on the floor for just under 90 seconds.  *See id.*, at 11:37:29 P.M. to 11:38:49 P.M.  The exhibit does not show particularly aggressive behavior by any of the officers.  However, the exhibit is inconclusive as to the precise manner in which plaintiff was restrained while the officers waited for defendant Slack to bring the restraint chair. Nevertheless, the Court again credits defendants' testimony that defendant Blake and Officer Jenkins used only one hand each to restrain plaintiff's body while Chaffins restrained plaintiff's legs.[15] Moreover, Chaffins' testimony corroborates defendants' version of the events to the extent that she denied seeing anyone put a knee in plaintiff's back or take any inappropriate action against plaintiff.

Finally, the record is uncontroverted that, once he was on the floor, plaintiff did not resist or fight the officers.

### I.    Fourth Alleged Use of Force: Use of the Restraint Chair

Defendants testified that, while plaintiff was restrained on the floor, defendant Blake instructed defendant Slack to retrieve a restraint chair. The restraint chair was described as a hard plastic chair on wheels, intended to contain an aggressive or violent inmate. According to defendant Blake, the use of the chair was necessary to assure that plaintiff, who had been combative, was calm. Defendant Slack agreed that the use of the chair gave plaintiff an opportunity to cool down.

The chair was placed near plaintiff, but out of the direct view

---

[15]Chaffins testified that, although she was on the floor near plaintiff's feet, she could not recall whether she actually restrained plaintiff.

of the camera monitoring the booking area.[16]  Defendant Slack strapped plaintiff into the chair with the assistance of Chaffins. Plaintiff testified that his head and bad arm were strapped in the chair and that the straps caused him pain.  Defendants Slack and Blake credibly testified that the restraint chair has no head strap.  Rather, a subject's arms and legs are secured by wrist and ankle straps; the restraint chair is also fitted with a lap belt and shoulder strap.  According to defendants Blake and Slack, a person restrained in the chair will not experience discomfort unless he tries to resist the restraints.

Plaintiff testified that he was in the chair for 20 to 30 minutes, but he could not recall if he said anything while in the restraint chair.  *Defendants' Exhibit D* indicates that plaintiff was in the restraint chair for approximately 18 minutes. Defendants Slack and Blake also testified that, because of a shift change, they left prior to plaintiff's release from the chair.

**J.    Fingerprinting and Hospital Visit**

Once out of the restraint chair, plaintiff's fingerprints were taken.  Upon plaintiff's release from the jail, a bondsman took him to a hospital.  Plaintiff then walked to his home.

**K.    Plaintiff's Complaint Filed With the Jail**

The next day, plaintiff complained to the Sheriff's Office of his treatment the night before.  Plaintiff specifically complained that arresting officers had removed him from the patrol car, had kicked him and had then thrown him back into the car.  An investigation was

---

[16]*Defendants' Exhibit D* shows indistinct views of plaintiff in the restraint chair, as reflected in a glass panel in the booking area.

undertaken.  According to Sheriff Lawless, who maintains the jails records, *Defendants' Exhibit B* contains true and accurate copies of the records related to that investigation.

## III. DISCUSSION

Plaintiff asserts his claims under 42 U.S.C. § 1983.[17]  To succeed on a claim for a violation of § 1983, a plaintiff must establish that (1) a person (2) acting under color of state law (3) deprived him of his rights secured by the United States Constitution or its laws.  *See Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001).  There is no dispute that defendants in this action acted under the color of state law. Because § 1983 is a method for vindicating federal rights, and is not itself a source of substantive rights, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

Here, plaintiff specifically alleges that defendants violated his rights by subjecting him to excessive force following his 2005 arrest. The Fourth Amendment, which is applicable to the states through the Fourteenth Amendment, *see Mapp v. Ohio*, 367 U.S. 643, 655 (1961), provides, "The right of the people to be secure in their persons, papers, and effects against unreasonable searches and seizures, shall

---

[17]Section 1983 provides in relevant part:

Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983.

not be violated, and no Warrants shall issue but upon probable cause. . . ." U.S. Const. amend. IV.[18] Accordingly, "[t]he Fourth Amendment prohibits the use of excessive force by arresting and investigating officers." *Smoak v. Hall*, 460 F.3d 768, 783 (6th Cir. 2006). "This prohibition extends to the use of force during booking procedures." *Meirthew v. Amore*, No. 09-1787, 2011 U.S. App. LEXIS 6638, at *7 (6th Cir. Mar. 30, 2011) (citing *Lawler v. City of Taylor*, Nos. 07-1329, 07-1442, 268 F. App'x 384, 386 (6th Cir. 2008); *Phelps v. Coy*, 286 F.3d 295, 300-01 (6th Cir. 2002)).

In analyzing excessive force claims under the Fourth Amendment, courts employ an "'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989). *See also Phelps*, 286 F.3d at 299. "In determining whether an officer's use of force was reasonable, [a court] must balance 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Schreiber v. Moe*, 596 F.3d 323, 332 (6th Cir. 2010) (citing *Graham*, 490 U.S. at 396). That balancing process requires a court to consider "the facts and circumstances of the particular case, including (1) the severity of the crime, (2) the immediacy of the threat posed by the suspects, and (3) whether the suspects were actively resisting or attempting to evade arrest." *Dorsey v. Barber*, 517 F.3d 389, 401 (6th Cir. 2008) (citing *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 486 (6th Cir. 2007)).

"'This standard contains a built-in measure of deference to the

---

[18]The parties previously agreed and the Court concluded that the Fourth Amendment applies to plaintiff's claims. *See Opinion and Order*, Doc. No. 43, pp. 6-8.

officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case.'" *Id.* (quoting *Smoak*, 460 F.3d at 783) (internal citations omitted). *See also Graham*, 409 U.S. at 397 ("[T]he 'reasonableness' inquiry . . . is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."). "The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. In addition, a court should consider "the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Id.* at 397.

**A.  First Alleged Use of Excessive Force:  Grabbing Plaintiff's Arm**

Plaintiff alleges that defendant Blake used excessive force when he decided "to tug at Mr. Crace's injured arm by surprise in an effort to get him to obey his verbal command[.]" Doc. No. 61, p. 17. In support of this argument, plaintiff contends that this action was unnecessary because of the existing circumstances, namely, (1) plaintiff "was doing nothing physical to warrant concern from the officers"; (2) plaintiff had an injured arm; (3) plaintiff was unarmed; (4) the officers outnumbered and outsized plaintiff; (5) the jail's booking area was secure; (6) there was no need for a split-second decision. *Id.* at 16-17.

This Court disagrees that this force was unnecessary. As discussed *supra*, plaintiff refused to undergo the fingerprinting process even after defendant Blake explained that doing so was standard policy. In light of plaintiff's refusal to cooperate with verbal commands, tugging on plaintiff's sleeve was a minimal intrusion justified by the legitimate governmental interest in maintaining an orderly booking process. Stated differently, when plaintiff refused to obey verbal commands, it was not unreasonable for defendant Blake to move up the use of force continuum and tug plaintiff's sleeve in order to effect compliance by plaintiff. *See*, *e.g.*, *Dorsey*, 517 F.3d at 401 (stating that the appropriate standard when evaluating the use of force includes "a built-in measure of deference to the officer's on-the-spot judgment about the level of force necessary in light of the circumstances of the particular case") (internal quotation marks omitted).[19] Indeed, the defense expert testified that a reasonable police officer would have been expected to utilize some measure of force in order to effect plaintiff's compliance with verbal commands. The expert went on to testify that defendant Blake's placement of his hands on plaintiff's shirt in an effort to guide plaintiff was an acceptable progression and a proper use of force. Therefore, after balancing the tugging on plaintiff's shirt against the governmental

---

[19]The Lawrence County Sheriff's Office policy and procedure regarding force specifically provides that physical force is permitted when an inmate refuses to obey jail rules. *Plaintiff's Exhibit 14*, p. 1. Although force should be used only as a last resort and should be limited to only that amount necessary to control the inmate, *id.*, the evidence establishes that defendant Blake had no other choice but to touch plaintiff to effect plaintiff's compliance. Tugging on the sleeve was a minimal use of force under these circumstances. Moreover, defendants' expert, who reviewed *Defendants' Exhibit D*, testified that defendant Blake properly invoked the use of force continuum at that moment.

need to insist that plaintiff comply with standard booking procedures, *see*, *e.g.*, *Schreiber*, 596 F.3d at 332, the Court concludes that this minimal force was reasonable and not excessive.

### B. Second Alleged Use of Excessive Force: Knocking Plaintiff to the Floor

Plaintiff next argues that defendant Blake used excessive force when he utilized the balance displacement leg sweep to knock plaintiff to the floor. In support of this argument, plaintiff contends, *inter alia*, that he was not actively resisting at the time the procedure was deployed and that he was in fact already under control. Doc. No. 61, pp. 18-19.

Again, this Court disagrees. As noted *supra*, the evidence establishes that plaintiff was actively resisting verbal commands to cooperate in the booking process and that defendant Blake believed that plaintiff could strike him or someone else. The Court rejects plaintiff's suggestion that, because plaintiff was unarmed and was outnumbered and outsized by the officers on the scene that night, force was entirely unnecessary. Specifically, plaintiff – who was apparently intoxicated – had been loud and verbally disruptive and abusive throughout his time in the booking room and, when he was touched by defendant Blake, plaintiff moved away, tensed his body and clenched at least one fist. The fact that plaintiff may not have rationally evaluated his conduct or the circumstances in which he found himself does not mean that a reasonable officer would not have concluded that plaintiff intended to strike him or someone else and therefore presented an immediate threat to security. Hamilton, defendants' expert on the use of force, testified that, if an officer

perceives that a detainee's actions will result in a physical altercation, it is preferable to displace the detainee to the floor. Indeed, the jail has a legitimate interest in maintaining safety and security. *Cf. Bell v. Wolfish*, 441 U.S. 520, 540, 546 (1979) ("The Government also has legitimate interests that stem from its need to manage the facility in which the individual is detained" and "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees."). Moreover, the Court finds that defendant Blake, in implementing the balance displacement technique, was careful to take plaintiff down in a controlled manner, which reduced the chance of injury to plaintiff. After weighing this use of force against the government's interest in maintaining a safe and secure jail and booking process, the Court concludes that it was objectively reasonable for defendant Blake to employ the balance displacement technique in order to control the situation generally and plaintiff in particular. The Court therefore concludes that this use of force was not excessive.

> **C.  Third and Fourth Alleged Uses of Excessive Force: Restraining Plaintiff on the Floor and Placing Plaintiff in the Restraint Chair**

Plaintiff also argues that his rights were violated when defendants Slack and Blake restrained him on the floor, noting that defendants testified that plaintiff was passive while on the floor. Doc. No. 61, p. 19. Plaintiff further contends that the use of the restraint chair (after having been pinned on the floor) was unnecessary because plaintiff was calm while on the floor. *Id*. at 20.

Plaintiff suggests that his restraint on the floor and his placement in the restraint chair were two separate uses of force that should be separately evaluated. However, the evidence establishes that defendant Blake and others held plaintiff on the floor while waiting for defendant Slack to bring the restraint chair. It follows that plaintiff's restraint on the floor and the chair were part of the same process; if the use of the restraint chair was constitutionally permissible, then holding plaintiff on the floor for a relatively short period time, until the chair was brought, was also appropriate. Accordingly, the Court will first consider whether plaintiff's placement in the restraint chair was an excessive use of force before turning to the continued restraint of plaintiff on the floor.

In the context of a Fourth Amendment excessive force analysis, the United States Court of Appeals for the Sixth Circuit has previously held that "the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law." *Morrison v. Bd. of Trs.*, 583 F.3d 394, 404 (6th Cir. 2009) (quoting *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 609 (6th Cir. 2006)). "The reason for this is that once the detainee ceases to pose a threat to the safety of the officers or others, the legitimate government interest in the application of significant force dissipates." *Morrison*, 583 F.3d at 404 (citing *Phelps*, 286 F.3d at 301-02).

Here, the testimony is uncontroverted that plaintiff did not resist or fight officers while he was pinned on the floor. However, less than 90 seconds had elapsed between the time that defendant Blake first touched plaintiff and the time that plaintiff was moved to the restraint chair. *See Defendants' Exhibit D*, at 11:37:23 P.M. to

11:38:49 P.M.  Defense expert Hamilton testified that, although
plaintiff did not struggle or resist while on the floor, he would
necessarily have still been experiencing an "adrenaline dump" and that
the danger posed by him would not yet have dissipated.  The testimony
of both defendants also reflects their belief that the use of the
chair was necessary to assure that plaintiff, who was intoxicated and
who had been combative, was now calm and posed no threat.  According
to Hamilton, the use of a restraint chair under such circumstances is
an excellent way to fully calm a person with little risk of harm.  He
also testified that the use of the chair is particularly appropriate
where, as here, the detainee was intoxicated. Moreover, according to
Hamilton, leaving a detainee in a restraint chair for less than 20
minutes is not excessive.  In Hamilton's opinion, the Lawrence County
officers performed as trained and acted as he would expect reasonable
officers to act.

In the view of this Court, even though plaintiff did not, during
the 90 seconds that he was on the floor, actively resist or fight the
officers, neither defendant – nor, indeed, a reasonable officer –
could have confidently concluded that plaintiff was at that point
"incapacitated or neutralized" had he been left unrestrained.  *See
Morrison v. Bd. of Trs.*, 583 F.3d at 404.  Because this safety threat
continued to exist even after plaintiff was pinned on the floor, there
remained a legitimate government interest in the use of force that
would remove this threat, namely, the use of the restraint chair.
Moreover, plaintiff's restraint in the chair for 18 minutes was not
excessive and, instead, lasted only long enough to assure that he was
in fact calm and no longer posed a threat of danger.  Accordingly,

after weighing the use of the restraint chair against the government's interest in safety within the jail, the Court concludes that this use of force was reasonable and not excessive.

As noted *supra*, restraining plaintiff on the ground for 90 seconds after the take down was an integral part of the decision to use, and of the process of using, the restraint chair. Having concluded that the use of the restraint chair was neither unreasonable nor excessive, the Court also concludes that restraining plaintiff on the floor while waiting for the chair was likewise appropriate.

**IV. CONCLUSIONS OF LAW**

This Court has jurisdiction over the claims asserted in this action. 28 U.S.C. § 1343. The Court is vested with jurisdiction over the parties.

The Court concludes that, for the reasons stated *supra*, plaintiff has failed to establish his claims against defendants Slack and Blake. Specifically, the Court concludes that the force used by defendants against plaintiff during the booking process was reasonable, was not excessive and did not violate plaintiff's constitutional rights.

The Clerk shall enter **FINAL JUDGMENT** in favor of defendants.

<div style="margin-left:40%">

_s/Norah McCann King_
Norah MᶜCann King
United States Magistrate Judge

</div>

September 10, 2012